UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACY KEIL,

        Plaintiff,                      Civil Action No. 10-cv-13973

    v.                                District Judge Nancy G. Edmunds
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 16]**

Plaintiff Stacy Brent Keil ("Plaintiff" or "Claimant") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions, (Dkts. 8, 16) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkts. 2, 11).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the ALJ has failed to adequately articulate his reasons for his disability determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff applied for DIB on July 17, 2007 alleging that he became unable to work on January 1, 1978. (Tr. 9, 75.) Plaintiff's date last insured ("DLI") is June 30, 1982. (Tr. 11.) The Commissioner denied Plaintiff's disability application on November 9, 2007. (Tr. 9, 48-51.) Plaintiff then requested a hearing, and on January 13, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Daniel G. Berk, who considered the case *de novo*. (Tr. 19-46.) In a January 29, 2010 decision, the ALJ found that Plaintiff was not disabled. (Tr. 9-12.) The ALJ's decision became the final decision of the Commissioner on August 9, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on October 5, 2010. (Dkt. 1.)

### B. Background

Plaintiff is 52 years old and was 19 years old on the alleged disability onset date. (Tr. 9, 81.) He has a high school education. (Tr. 91.) Plaintiff does not premise his claim for disability on any physical impairment. Plaintiff was born premature and, while growing up, was slow to reach developmental milestones. (Tr. 139.) According to Plaintiff's parents, testing conducted when he was five years old suggested mild cerebral palsy. (*Id.*)

#### 1. The Hearing Before the ALJ

##### a. Plaintiff's Testimony

Plaintiff provided no direct testimony regarding the nature of his mental impairments or its limiting effects. In fact, he could not recall being treated at Beaumont Hospital for a suicide attempt in 1980. (*See* Tr. 26.) Plaintiff did testify, however, about his past work and his activities of daily

living.

Plaintiff's has performed only two limited-duration, part-time jobs during his lifetime. (Tr. 87, 155; *see also* Tr. 23.) He testified that he worked part time at a bowling alley a "long, long time ago"; that job involved cleaning up the parking lot and washing windows. (Tr. 23.) He also testified that he delivered phone books "a couple times" but could not remember when. (Tr. 23.)

Regarding his activities of daily living, Plaintiff testified that he lives alone in a house owned by his mother. (Tr. 24.) He cooks for himself, but said his meals consist of cereal (presumably for breakfast), hot dogs or sandwiches for lunch, and for dinner, sandwiches, soup, and/or TV dinners. (Tr. 24.) Plaintiff also testified, "I'm busy. I went on radio stations. That's what – I do that. And I do the chores, you know, around the house that has to be done. It has to be taken care of." (Tr. 26.) A self-completed disability form provides that Plaintiff does laundry, cuts the grass, shops for food, reads newspapers, and is an "avid sports fan." (Tr. 112-14.) When asked if he ever had any friends, Plaintiff testified "[m]aybe a friend, yeah. . . . I forget." (Tr. 26.) An acquaintance drives him to see his mother who suffers from Alzheimer's and lives in a care facility. (Tr. 24, 27.)

*b. Lay Witness Testimony*

Lowell Solinsky, Plaintiff's cousin who has known Plaintiff since birth, testified on Plaintiff's behalf at the hearing before the ALJ. Regarding Plaintiff's home, Solinsky testified that it was not well kept: "slovenly, garbage in the kitchen . . . odor in the house, rooms being used for storage, old newspapers, mailings, you know, all over the house." (Tr. 31.) He testified that when Plaintiff's parents lived in the home, they maintained the home in better condition. (*Id.*)

Regarding Plaintiff's personality and social functioning, Solinsky testified that

> He doesn't seem to focus if you want to have a conversation with
> him, he's kind of – he's all over the place. If I were to call him to see

3

> how he's doing, he'll just jump on, well, today I saw a neighbor who paid me $5.00 to, you know, clean up the yard. And then I had an earache. It's kind of disjointed conversation.

(Tr. 32.) Solinsky further stated that Plaintiff has "always been like that. That's not new," (Tr. 32), and that when he saw Plaintiff back in grade and high school years, Plaintiff was "spacey" and "seemed like he was a lot younger than his chronological age," (Tr. 38). Solinsky testified that he never attempted to have any substantive conversations with Plaintiff when the two were growing up because, "I really didn't think, you know, that I could." (Tr. 38.)

In his disability determination, the ALJ relied heavily on Solinsky's testimony "indicating that the claimant has significantly deteriorated recently, and that the claimant's condition is worse since his father died approximately four years ago." (Tr. 11.) In that regard, Solinsky testified that a probate issue following Plaintiff's father's death around "four or five years ago" lead him to become more involved in Plaintiff's life. (Tr. 33, 39.) In response to Plaintiff's counsel's question, "having . . . seen him all these years, how much has he changed," Solinsky replied, "He's deteriorated quite a bit. Again, I want to point out the way he presented today. And this, you know, he's been going downhill. . . . God knows what . . . next week or next month is going to bring." (Tr. 38-39.)

But subsequently Solinsky was asked, "If you could think back to, you know, when he was in his late teens, early 20s, and you compare his condition to now, how would you say? Is it the same? Is it better? Is it worse?" And Solinsky responded:

> Oh, much worse. Again, when [his] mom and dad were alive and before his mother started, you know, going down hill with her Alzheimer's, I mean, they were there to take care of the – you know, Stacy. I was going to call him the kid. He's a 51 year old kid. But, so you know, excuse me for that reference of, you know, calling him that. But, you know, mom and dad were present.

> Q. And from what you knew of him at that point in time, would he have been capable of taking care of himself if his parents weren't around?
> A. I doubt it.
> Q: Why not?
> ALJ: At what point in time are you referring to?
> ATTY: This would be late teens, early 20's?
> WTN: 20's, yeah, in high school years, I'd say, going back there.

(Tr. 39-40.) Further, when Solinsky was asked if Plaintiff could have taken care of himself from ages 18 to 22, he responded,

> No. I don't think so. I never saw any initiative on Stacy's part. Everything that was done – all of Stacy's care – I never had any reason to believe that Stacy could care for himself. You know, as a teenager, as a high school student. Again, mom and dad hovered over him. . . .
> Q: And did any of that ever change? I mean, did he ever get to the point, that you saw, that he would be able to take care of himself?
> A: No, I can't imagine how.
> ALJ: Excuse me, that – imagining is not relevant testimony.
> WTN: Okay. Maybe I should choose a different word. I don't see how, you know, based on, you know, my contacts with Stacy, you know, over the years.

(Tr. 40-41.)[1]

### 2. Medical Evidence

#### a. Medical Evidence From Before Plaintiff's Date Last Insured

On August 27, 1980, when Plaintiff was 21 years old, he was admitted to the hospital for close to a month because of multiple self-inflicted stab wounds from an attempted suicide. (*See* Tr. 139.) Two weeks prior to the incident, Plaintiff had become frustrated with his job as a maintenance worker at a bowling alley because he was unable to communicate and believed he had received

---

[1]There was no Vocational Expert testimony at the hearing. Plaintiff asserts that an unexpected event caused the VE to leave prior to the start of the hearing. (Dkt. 8, Pl.'s Mot. Summ. J. at 5.)

conflicting and confusing orders from his supervisors. (Tr. 139.) Plaintiff felt discouraged that he could not perform his duties properly. (*Id.*) Additionally, a co-worker had suggested that the work Plaintiff was doing was below him and he should have a better job. (*Id.*) Plaintiff also feared that people in the community intended to hurt his family. (*Id.*)

Plaintiff's parents informed hospital staff that Plaintiff was born premature (weighing two-and-a-half pounds and staying in an incubator for three-and-a-half months (Tr. 258)), and, while growing up, Plaintiff was slow to reach developmental milestones, (Tr. 139). They also reported that testing at five years old suggested Plaintiff had mild cerebral palsy. (Tr. 139.) But Plaintiff took regular classes and graduated high school. (Tr. 139, 151.) And after high school, Plaintiff began working part-time for the bowling alley. (Tr. 95, 139.)

Two days after admission to the hospital, it appears that Plaintiff was admitted to the psychiatric unit. The "Admission Note" checked a box indicating that Plaintiff had the presence of an organic brain disturbance with an accompanying notation of "slow learner, easily confused." (Tr. 146.) However, the evaluator also noted that Plaintiff was cooperative and tried to "relate in a healthy manner." (Tr. 147.) The "Differential Diagnoses" was "probable mental retardation" with instruction to rule out schizophrenic disorder. (Tr. 147.)

On September 16, 1980, Plaintiff was referred for a psychological evaluation. The psychologist noted that "the presence of occasional perceptual distortions, poor form level on some of the responses and some impaired reality testing gives evidence of the preliminary stages of a psychosis with formal thought disorder." (Tr. 263.) This assessment similarly noted "[t]he clinical picture, social history and psychological test findings are consistent with an early stage of psychosis [i]n this [patient]. Currently, an emergency of psychotic features may be masked by depression."

6

(Tr. 264.) The assessment indicated that Plaintiff might benefit from "reality-oriented" group therapy and vocational counseling. (*Id.*)

The hospital discharged Plaintiff on September 20, 1980. (Tr. 245.) The discharge summary noted that Plaintiff

> had good memory, good mentation, but had rather concrete simplicity type thinking that suggested that he was mentally retarded. However the patient told me that he came in third in a ches[s] tournament so he was tested psychologically. He was found indeed not to be mentally retarded. He had an overall full scale I.Q. of 105 with exceeding good skills particularly in visual perception and arrangement. He does well on . . . math[e]matical calculations. However[,] his ability to abstract is rather impaired and he seems to be quite shy and awkward socially.

(Tr. 245.) Plaintiff, who had seen a vocational counselor on several occasions while hospitalized, intended to follow up with vocational counseling at home. (Tr. 246.) He also accepted a referral for family therapy. (*Id.*) At discharge, Plaintiff's doctor felt he was not a danger to himself or others, and Plaintiff was diagnosed with "major affective disturbance, single episode." (*Id.*)

### b. Medical Evidence From After Plaintiff's Date Last Insured

In June 2007, Dr. Philip Margolis, a professor of psychiatry at the University of Michigan, evaluated Plaintiff (apparently at the request of Plaintiff's sister's attorney who thought that Plaintiff might not be disabled). (Tr. 154-55.)[2] Dr. Margolis reviewed a 2001 police report regarding Plaintiff's threats to his parents. (Tr. 154.) He noted that Plaintiff was then considered mentally ill, and that Providence Hospital diagnosed him with "acute psychosis, [not otherwise specified]." (*Id.*) "About one month later[,] a treatment team considered the following: Axis I: Depression, Axis II:

---

[2]This may relate to the probate dispute between Plaintiff and his sister; apparently, Plaintiff's sister took out $40,000 worth of savings bonds from a safety deposit box left for Plaintiff after his father's death. (Tr. 39, 224.)

Schizotypal Personality Disorder, Axis III: Otalgia. At that time, he was given medication and placed in a support group. Prognosis on discharge was guarded." (*Id.*)

Regarding Plaintiff's lifestyle, Dr. Margolis noted that Plaintiff was familiar with news events, followed sports, and rode his bicycle to the grocery store. (Tr. 155.) Plaintiff noted his bike was 39 years old and that while his father left him money for a new bike, he was satisfied with the old one. (*Id.*) Plaintiff told Dr. Margolis that he took care of the house, including gardening and cutting the grass. (*Id.*) Dr. Margolis noted that Plaintiff had not worked for 20 years or more, never held full-time work, and "always lived with his parents; he apparently became quite dependant on them." (Tr. 155.) Plaintiff informed Dr. Margolis that he had never dated or had sexual feelings toward men or women. (Tr. 156.)

Plaintiff denied delusions or hallucinations and did not admit to "psychotic mentation, now or in the past." (Tr. 156.) Dr. Margolis commented that "denial appears to serve a significant role in [Plaintiff's] defense system." (*Id.*)

Dr. Margolis also had a brief discussion with Plaintiff's cousin, Solinsky, who Margolis found to be "a credible informant." (Tr. 156.) Solinsky relayed Plaintiff's premature birth, that his parents had been "very protective," and that Plaintiff had developmental problems such as tying his shoes. (*Id.*) Solinsky told Dr. Margolis that he once wondered if Plaintiff was "running out of money" with Plaintiff replying, "I never thought of that." (*Id.*) Solinsky also said that Plaintiff's house was "a mess" and Plaintiff neither admitted nor denied the statement. (*Id.*)

Dr. Margolis opined that an earlier diagnoses of "chronic (paranoid) schizophrenia [was] accurate." (Tr. 156.) He explained that Plaintiff "has some anxiety and some depression, and major symptomatology related to lack of motivation, lack of affect and inability to relate to others. At

times he is fearful, almost of his own shadow." (*Id.*) He further explained,

> In my judgment, Mr. Keil is seriously impaired, not because of anxiety and depression, but rather because of a long history of mental illness which deprives him of motivation and drive, interest and verve. These impairments are long-standing and prevent him from working or enjoying many of the usual perquisites of carrying on a daily life with interpersonal relationships. Instead, he isolates himself and withdraws from social interactions. There are strong schizotypal/schizoid traits inherent in his personality.

(*Id.*) Dr. Margolis concluded by stating that Plaintiff was "seriously impaired and unable to work" but did not rule out the possibility of work in the future. (Tr. 157.)

In October 2007, Dr. Sung-Rao Cho, a psychiatrist, evaluated Plaintiff on behalf of the State Disability Determination Service ("DDS"). (Tr. 223-26.) Dr. Cho observed Plaintiff to be clean but unkempt and "childish." (Tr. 224, 226.) Dr. Cho commented that Plaintiff "was anxious and guarded and denied any psychiatric problems but was preoccupied with inner ear pains." (Tr. 226.) He noted that Plaintiff did not have any close friends. (Tr. 224.) He found Plaintiff to have good contact with reality but stated that Plaintiff appeared to be depressed. (Tr. 225-26.) Dr. Cho diagnosed Plaintiff with major depression, recurrent, severe, assigned him a Global Assessment Functioning score of 45 to 50[3] and gave a prognosis of "poor." (Tr. 226.)

In November 2007, Dr. Fouad Batah examined Plaintiff on behalf of the State DDS.

---

[3] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

Plaintiff's cousin spoke for Plaintiff because Plaintiff asserted he had tonsillitis. (Tr. 228.)[4] Dr. Batah commented, apparently based on Solinsky's recounted history of Plaintiff's medical conditions and/or Dr. Margolis' opinion, that Plaintiff "has a long history of paranoid schizophrenic disorder" and that Plaintiff "has suffered with psychiatric disorders all his life." (Tr. 228.) Dr. Batah's "impression" was "[l]ong history of Paranoid Schizophrenia. The patient currently is not being treated, but no evidence of any suicidal thoughts or any delusions or hallucinations." (Tr. 229.)

Also in November 2007, Dr. Edward Czarnecki completed a Psychiatric Review Technique Form on behalf of the State DDS. (Tr. 230-42.) It appears that Dr. Czarnecki reviewed Plaintiff's 1980 treatment records, Dr. Margolis' opinion, and the October 2007 consultative exam with Dr. Cho. (Tr. 242.) Dr. Czarnecki concluded that there was insufficient evidence for him to make a medical disposition. (Tr. 230.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be

---

[4]Similarly, Plaintiff spoke very softly at the hearing, in a "semi whisper" to Dr. Margolis, and was preoccupied with his inner ear pain during the evaluation with Dr. Cho. (Tr. 154.) It appears that Plaintiff has a history of treatment by ear, nose, and throat physician(s), but Dr. Margolis noted that consistent with a diagnosis of chronic schizophrenia, Plaintiff "would have intermittent somatic symptoms which begin as genuine in nature, later becoming part of a more less fixed delusional system." (Tr. 156.)

10

>expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

>Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
>Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
>Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
>Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity between January 1, 1978, Plaintiff's alleged onset date, and June 30, 1982, Plaintiff's date last

insured. (Tr. 11.) At Step Two, the ALJ did not explicitly find that, prior to the DLI, Plaintiff did not have a "severe" impairment that lasted or was expected to last for a continuous period of at least twelve months. Instead, he concluded that "the file does not contain sufficient evidence to establish disability prior to the date last insured." (Tr. 11.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

Plaintiff asserts that the ALJ erred by failing to discuss the 1980 medical records from Beaumont Hospital and Dr. Margolis' 2007 opinion as required by 20 C.F.R. § 404.1527(d) (providing that "[r]egardless of its source, we will evaluate every medical opinion we receive") and 20 C.F.R. § 404.1527(d)(2) (the explanatory requirement of the "treating source" rule). To the extent that Plaintiff asserts that the Beaumont physicians or Dr. Margolis were treating sources (*see* Pl.'s Mot. Summ. J. at 4), this Court disagrees. It appears that Dr. Margolis only evaluated Plaintiff once, and the record indicates that Beaumont physicians treated Plaintiff for only one month and that Plaintiff saw several different doctors during that time. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances

and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). And to the extent that Plaintiff asserts that the ALJ had to comply with the explanatory aspect of the treating source rule because the Beaumont physicians and Dr. Margolis were examining sources (*see* Pl.'s Mot. Summ. J. at 4), this Court again disagrees. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875-76 (6th Cir. 2007) ("Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits. Importantly, though, this reasons-giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 404.1527(d). . . . [T]he SSA requires ALJs to give reasons for only *treating* sources.").

But this Court does agree with Plaintiff's implication that the ALJ's opinion is procedurally deficient because of inadequate explanation. This Court "'may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'" *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011) *report adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) (quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009)); *see also Grandchamp v. Comm'r of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision. Most importantly he must build an accurate and logical bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *cf. Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (noting that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must

14

articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). "It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." *Hurst v. Secretary of Health and Human Servs.*, 753 F.2d 517, 519 (6th Cir.1985) (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

> Here, the ALJ provided the following explanation for denying Plaintiff disability benefits:
>
>> The claimant asserts disability as of January 1, 1978. This is a disability insurance benefits only case with no supplemental security income claim. The claimant's date last insured is June 30, 1982. The file does not contain sufficient evidence to establish disability to the date last insured. This is particularly true, given the claimant's cousin's testimony indicating that the claimant has significantly deteriorated recently, and that the claimant's condition is worse since his father died approximately four years ago.

(Tr. 11.)

The record does establish that in response to Plaintiff's counsel's question about how Plaintiff has changed over the years, Solinsky responded, "He's deteriorated quite a bit." (Tr. 38.) But in response to a question asking Solinsky to compare Plaintiff's condition from his late teens and early 20s to the present day, Solinsky appeared to clarify his position. He suggested that Plaintiff's condition is now "much worse" than in his teens and early 20s because "when Plaintiff's mom and dad were alive and before his mother started, you know, going down hill with her Alzheimer's . . . they were there to take care of . . . [Keil]." (Tr. 39.) That is, it appears that Solinsky was not testifying that Plaintiff's mental impairments have gotten "much worse" since his father's death, but rather Plaintiff's appearance in the absence of his parents' care had worsened. The following testimony from Solinsky, while admittedly ambiguous, further undermines the ALJ's

interpretation of the phrase "deteriorated quite a bit":

> Q. . . . Can you describe [the claimant] for us?
> A. At the moment, currently, disheveled appearance, sloppy if you will, colors that don't match, clothes that are worn and probably a bit of an odor that I'm sensitive to, which is typical for [Keil]. He's been that way – the way he presented today, he's been that way for ages.
> Q. Was he like that when he was living with his folks?
> A. Pretty much. His father is now deceased. His mother is in a care facility for Alzheimer's patients. And when the parents were taking care of [Keil], it was very similar to now. You know, essentially the same presentation, the same verbal skills. You know, the way he came across today is the way, to sum up, he's been for the longest time.
> Q. And I guess the real question was he like that before – when he was a teenage[r]?
> A. No, not as much. As a teenager, his parents were able to groom him. So the presentation, you know, when he was in his teens, a high school student, was a lot neater.
> *Q. And when his parents weren't around to groom him, as you say, what happened?*
> A. Well, essentially what you're seeing now. When his mother got sick, you know, she was developing Alzheimer's and finally diagnosed, it – *that's when I remember him, you know, appearing as he does at the moment.*

(Tr. 30-31 (emphasis added).)

    Moreover, at multiple points in his testimony, Solinsky attested to Plaintiff's mental problems dating back to his teenage years and when Plaintiff was in his 20s. Solinsky said that when the Plaintiff was in junior high and high school, he thought Plaintiff was incapable of carrying on a substantive conversation. (Tr. 38.) Solinsky testified that during that time period, Plaintiff was "spacey" and acted "a lot younger than his chronological age." (Tr. 38.) Solinsky attested that he did not think Plaintiff could have cared for himself when he was a teenager and in his early 20s. (Tr. 40-41.) He stated that between ages 18 and 22 Plaintiff had a "lack of affect where there was just no interaction or, at least, nothing that would have me believe that . . . [Keil] was well-adjusted.

16

It was like, you know off somewhere." (Tr. 42-43.)

Given the foregoing, this Court finds that the ALJ's reliance on Solinsky's testimony that Plaintiff had "deteriorated" recently or "worsen[ed] since his father died" is not a "legitimate reason for his decision." First, it appears to this Court that when Solinsky testified that Plaintiff's condition has deteriorated in the last few years, he meant it in the sense that Plaintiff has been unable to care for himself since his father died and his mother became sick – not, as the ALJ suggests, that Plaintiff's cognitive abilities or mental impairments have worsened since that time. And even giving deference to the ALJ's interpretation of Solinsky's testimony, and therefore assuming that Solinsky testified that Plaintiff's mental impairments themselves have worsened since his father passed away, this does not address Solinsky's testimony that since Plaintiff was a teenager he was "spacey," could not care for himself, was not "well-adjusted," could not carry on a substantive conversation, and behaved a lot younger than his chronological age. That is, even if Plaintiff's mental impairments have worsened since his father's death, this does not preclude the presence of a disabling impairment prior to that time, or, more importantly, as Solinsky suggested, prior to the date last insured in 1982.[5]

The Court also finds problematic that the ALJ's narrative does not mention any of the post-DLI evidence – or even the 1980 medical records. Apparently, and without the benefit of the ALJ's explanation to the contrary, the ALJ thought that any post-DLI evidence was irrelevant to the

---

[5]In this same vein, the ALJ's conclusion that Plaintiff's condition had worsened since Plaintiff's father's death sometime around 2005 does not account for the fact that Dr. Margolis noted that in 2001 Plaintiff had been diagnosed by Providence Hospital with "acute psychosis." (Tr. 154.) And that during that time a treatment team considered or diagnosed "Schizotypal Personality Disorder," prescribed medication, gave Plaintiff a prognosis of "guarded," and placed Plaintiff in a support group. (Tr. 154.) Again, a recently deteriorating condition does not necessarily mean that Plaintiff's prior condition was not disabling.

question of whether Plaintiff was disabled on or before June 30, 1982. In fact, the Commissioner asserts that "[t]he ALJ repeatedly explained during direct examination of Mr. Solinsky that, because most of his testimony did not describe Plaintiff prior to his DLI, it was irrelevant." (Def.'s Mot. Summ. J. at 11.) And in response to Plaintiff's argument that the ALJ should have considered the post-DLI medical opinions, the Commissioner states, "the ALJ's decision makes clear that this evidence was not relevant to the disability determination because it did not pertain to the period when Plaintiff was still insured." (Def.'s Mot. Summ. J. at 10.)

Admittedly, "evidence relating to a time outside the insured period is only minimally probative" to the disability determination, but the Sixth Circuit has stated that it nonetheless "may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355 (6th Cir. 1999) (citing *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988)); *see also Swartz v. Barnhart*, 188 F. App'x 361, 369-70 (6th Cir. 2006). And here, Dr. Margolis opined,

> Mr. Keil is seriously impaired, not because of anxiety and depression, but rather because of a *long history of mental illness* which deprives him of motivation and drive, interest and verve. These impairments are *long-standing* and prevent him from working or enjoying many of the usual perquisites of carrying on a daily life with interpersonal relationships.

(Tr. 156.) Similarly, although perhaps relying in part on Dr. Margolis' opinion, Dr. Batah stated that Plaintiff "has a long history of paranoid schizophrenic disorder" and that Plaintiff "has suffered with psychiatric disorders all his life." (Tr. 228-29.) The ALJ has not evidenced to this Court how, if at all, these opinions were folded into his disability calculus. *Cf. Swartz*, 188 F. App'x at 369-70 (remanding to ALJ where, *inter alia*, the ALJ failed to explain why "no weight [was] given to the several [post-DLI] medical opinions that [Plaintiff's] problems are life-long conditions").

In sum, the ALJ's narrative deprives this Court of "an accurate and logical bridge between the evidence and the result," *Pollaccia*, 2011 WL 281044, at *6, and does not permit this Court "to trace the path of [the ALJ's] reasoning," *Lowery*, 55 F. App'x at 339. The narrative provides that there is insufficient medical evidence to establish disability prior to the DLI, but does not reference a single piece of medical evidence in the administrative record. In particular, the ALJ did not comment upon 1980 medical records stating that Plaintiff's "clinical picture, social history and psychological test findings are consistent with an early stage of psychosis" (Tr. 264), nor did he evidence to this Court that he considered post-DLI evidence suggesting that Plaintiff's mental impairments were life long or, at least, have a "long history." Indeed, the ALJ did not even say he relied upon Dr. Czarnecki's PRTF indicating insufficient medical evidence. Instead, the ALJ pointed to Solinsky's ambiguous testimony that Plaintiff's condition has worsened since his father's death, without reconciling Solinsky's other testimony about Plaintiff's mental abilities during his teenage years and early-20s, and without explaining how Plaintiff's condition prior to his father's death, assuming it was better, could not have still been disabling. Accordingly, this Court recommends remand.

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ has failed to adequately articulate his reasons for his disability determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

**III. FILING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                              s/Laurie J. Michelson  
                                              LAURIE J. MICHELSON  
                                              UNITED STATES MAGISTRATE JUDGE

Dated: August 30, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 30, 2011.

                                              s/Jane Johnson  
                                              Deputy Clerk